**Roy HILLSTROM**

v.

**BEST WESTERN TLC HOTEL**

**No. CIV.A. 01–10644–RGS.**

United States District Court,
D. Massachusetts.

May 28, 2003.

Dax Bowers Grantham, Cutler McLeod, P.C., Boston, for Roy Hillstrom, (Plaintiff).

Laurie J. Hurtt, Jackson, Lewis, Schnitzler & Krupman, Boston, for Best Western TLC Hotel, (Defendant).

William J. McLeod, Cutler McLeod, P.C., Boston, for Roy Hillstrom, (Plaintiff).

Robert S. Messinger, Cutler McLeod, P.C., Boston, for Roy Hillstrom, (Plaintiff).

Guy P. Tully, Jackson, Lewis, Schnitzler & Krupman, Boston.

## *MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

Roy Hillstrom alleges that he was unlawfully terminated by the Best Western TLC Hotel (Best Western TLC) in Waltham, Massachusetts, because of his age and gender. He also asserts a contractual breach of the disciplinary provisions of Best Western TLC's employee handbook. Finally, he maintains that Best Western TLC violated the job protection guarantees of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. Best Western TLC counters that Hillstrom was terminated for poor job performance, and denies the existence of a contractual relationship. Best Western TLC moves for summary judgment.[1]

## *BACKGROUND*

The following facts are taken, in the light most favorable to Hillstrom, from the First Amended Complaint, Hillstrom's deposition, the depositions of Best Western TLC employees, and Best Western TLC's Statement of Undisputed Facts.

The defendant Best Western TLC is a 100 room hotel in Waltham, Massachusetts owned by The LaCava Company (LaCava). In addition to the Best Western TLC, LaCava owns and operates the Best Western Hotel and Trade Center in Marlborough, Massachusetts, and the Fitchburg Royal Plaza in Fitchburg, Massachusetts.

LaCava also once owned the East Hotel in Waltham.

Hillstrom, who was forty-two years old when he was terminated, was hired by Best Western TLC in November of 1981 as a night manager. Best Western TLC then had two management components—a Rooms Division and a Food and Beverage Division. The Rooms Division was responsible for housekeeping, maintenance, reservations, and front desk operations. The Food and Beverage Division oversaw the hotel restaurant, lounge, and meeting spaces. Prior to January 1, 1999, the Food and Beverage Division was managed by Norben, Inc., an outside caterer.

In 1988, Hillstrom was promoted to the position of day manager of the Best Western TLC and the affiliated East Hotel. As the day manager, Hillstrom reported directly to the president of LaCava, Anthony LaCava Sr. LaCava Sr. was based at the Royal Plaza Hotel in Marlborough, but visited the Waltham properties once every two or three months. In 1990, LaCava Sr. named Hillstrom as General Manager of the Rooms Division at the two hotels. As General Manager, Hillstrom's duties encompassed "everything" involved with the Rooms Division; he oversaw reservations, front desk operations, housekeeping, and maintenance; he hired, supervised, and prepared the performance evaluations of all Rooms Division employees. In 1994, LaCava sold the East Hotel. Hillstrom continued to oversee the Rooms Division at the Best Western TLC.[2] In 1994, upon the death of LaCava Sr., his son, Anthony, became president of LaCava. Hillstrom now reported directly to LaCava Jr.

---

**1.** Hillstrom's First Amended Complaint asserts the following claims: Count I—Violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a) and the Equal Employment Opportunities Act, 42 U.S.C. § 2000(e)–2; Count II—Violations of the Massachusetts Anti–Discrimination Statute, G.L. c. 151B; Count III—Violation of the FMLA; and Count IV—Breach of Contract.

**2.** Best Western TLC issued Hillstrom business cards bearing the title "General Manager."

After being hired by Best Western TLC, Hillstrom received a copy of the LaCava employee handbook. The handbook provided for a "Disciplinary Procedure," the essential provisions of which were as follows:

The Company endorses a policy of progressive discipline in which it attempts to provide employees with notice of deficiency and opportunity to improve. It does however, retain the right to administer discipline, up to and including discharge, as we deem fit in our judgement [sic].

The Company may not[3] use discipline consisting of a verbal or written warning, considering all the circumstances of each case.

*STEP 1*—If an employee is not meeting the company standards of behavior and performance, the employees (sic) supervisor will take the following action:

1. Meet with the employee to discuss the matter;
2. Inform the employee of the nature of the problem and the action necessary to correct it;
3. Issue an oral warning using the Employee Warning Notice/Termination Form. The oral warning should be documented and signed by the department manager as well as issuing supervisor. The supervisor should document the incident by completing the Employee Warning Notice/Termination Form. The supervisor should retain a copy. The original should be sent in confidence to the Human Resources Department and will be maintained in the respective personnel file.

*STEP 2*—If there is a second violation of a similar nature or an employee who is experiencing a series of unrelated problems involving job performance and/or behavior, the supervisor will hold another meeting with the employee and take the following action:

1. Issue a written warning to the employee documenting the incident on an Employee Warning Notice/Termination form;
2. The supervisor should retain a copy. The original should be sent in confidence to the Human Resources Department and will be maintained in the respective personnel file.
3. Warn the employee that a 3rd violation will result in termination.

*STEP 3*—If there is a third violation of the Company's Employee Warning Policy, the supervisor will take the following action:

1. Issue a written warning to the employee documenting the incident on an Employee Warning Notice/Termination form;
2. Terminate the employee. Notice of the termination should be handled carefully and discretely, preferably in a private meeting; include the employee to be terminated, the immediate supervisor, and the Human Resource Manager or Department Manager.

The handbook contained several provisions disavowing any intention to create a contract. In the "Purpose of this Handbook" section on page 3, it specifically stated that, "[t]his handbook is intended for management and employee guidance only and is not to set forth any binding

___
**3.** Although the grammar is somewhat awkward, the word "not" is used in the permissive rather than the prescriptive sense.

rights or be a contract." Another disclaimer was found in the "Employee Handbook Acknowledgment" form that was signed by Hillstrom on June 4, 1999. The form stated that, "[t]he language used in this handbook is not intended to create, nor is it to be construed to constitute, a contract between The LaCava Company and any one or all of its employees. Your employment with The LaCava Company is at-will employment and either you or The LaCava Company may terminate the employment relationship at any time, with or without notice, for any or no reason." The "Disciplinary Procedure" section of the handbook, upon which Hillstrom bases his claim, also contained a disclaimer that The LaCava Company "does[,] however, retain the right to administer discipline, up to and including discharge, as we deem fit in our judgement [sic]," and that, "[t]he company may not use discipline consisting of a verbal or written warning, considering all the circumstances of each case." Finally, LaCava reserved "the right to modify the handbook's terms" in its discretion at any time.

As General Manager, Hillstrom believed that he had the "absolute right" to terminate employees without consulting LaCava's Human Resources Department or observing each step of the formal disciplinary procedure. Hillstrom estimated that he had terminated fifteen employees during his tenure as General Manager, including some who had incurred no prior disciplinary infractions.

Hillstrom suffered an aneurysm in January of 1999. As a result, he missed work for approximately six weeks. During his absence, Hillstrom received full pay and benefits. He then returned to work part-time, and after two weeks, resumed work full-time.[4]

Some months prior to Hillstrom's illness, Matthew Phipps approached LaCava Jr. about becoming the General Manager of the Best Western TLC. Phipps, who had been hired by LaCava in 1995 as the rooms director at the Royal Plaza Hotel, had since been promoted to oversee the hotel's Food and Beverage Division. Phipps presented LaCava Jr. with a series of ideas for growing business at the Best Western TLC and improving its performance. LaCava Jr. declined, as the Best Western TLC was undergoing renovations, and was in the process of reacquiring management of the Food and Beverage Division from Norben, Inc.

In February of 1999, while Hillstrom was on sick leave, LaCava Jr. changed his mind and offered Phipps the General Manager's position.[5] According to LaCava Jr., Phipps was hired as part of a plan to consolidate the hotel's management and reduce the number of persons reporting directly to him. "[W]e spent a considerable amount of money on renovating the facility and I was holding off as long as possible before I hired someone to take over the property.... I assigned a general manager for each of our other properties and sat down with [my] financial people and we decided that ... we had the money to [bring someone on as General Manager of the Best Western TLC]." LaCava Jr. stated that, while he was satisfied with Hillstrom's performance as manager of the

---

**4.** Although there is no evidence in the record that Hillstrom specifically requested FMLA leave, there is no dispute that his leave qualified under the Act. *Cf. Price v. City of Fort Wayne,* 117 F.3d 1022, 1026 (7th Cir.1997).

**5.** Best Western TLC maintains that Hillstrom's competing title of "General Manager" referred solely to his responsibility for the Rooms Division, while the new General Manager's position encompassed oversight of both the Rooms Division and the Food and Beverage Division.

Rooms Division, he chose Phipps as General Manager because of his food and beverage experience.

Hillstrom returned to work in March of 1999. Upon his return, Hillstrom found that he no longer reported to LaCava Jr., but to Phipps. Phipps had taken over what had been Hillstrom's office and had removed all of Hillstrom's belongings. Hillstrom was relocated to an office that he now shared with the hotel's front desk employees. Hillstrom's title was changed to Rooms Division Manager, and he was instructed "to continue on doing the exact same job as [he] had always done." Hillstrom's pay and benefits remained the same. Hillstrom was told that Phipps, as the General Manager, would concentrate on improving the hotel's food and beverage service. Despite the assurances, the responsibilities of Hillstrom's job began to diminish as Phipps "took over the responsibilities for maintenance, hotel renovation and began to take over the housekeeping responsibilities." [6]

Over the next six or seven months, Phipps became increasingly critical of Hillstrom for failing to enforce hotel procedures that he had implemented, such as fully listing available rooms in the Best Western master reservation system, requiring front desk clerks to use a guest's name three times during check-in, and requiring front office employees to wear uniforms. Phipps conveyed his concerns to Hillstrom, and asked that he sign an Employee Warning Notice. In doing so, Hillstrom acknowledged the potential for termination if his performance did not improve. Hillstrom recalls that during their meeting Phipps was "hostile, belligerent and threatening," and refused to let him speak.

Phipps repeated his criticisms in a memorandum addressed to Hillstrom on March 27, 2000. Phipps informed Hillstrom that he had thirty days to address eight identified shortcomings or "discussion of your continued employment will be initiated." [7] Hillstrom complained about the memorandum to Denise Blaise, LaCava's head of human resources.

Approximately two weeks after Hillstrom received the reprimand, Phipps hired Eva Auranen as a front desk clerk. Although Hillstrom's duties included the training of new desk clerks, he was not asked to train Auranen. Hillstrom was terminated on April 26, 2000, on the expiration of the thirty-day probation period. Phipps then "promoted Auranen to Front Desk Manager in which [position] she assumed the majority of Hillstrom's duties." Hillstrom's housekeeping responsibilities were assumed by Phipps. [8]

6. Hillstrom's testimony that he was removed from oversight of the renovation of the hotel appears to be a misstatement as it is undisputed that the renovation project had been completed by the time Hillstrom returned from medical leave.

7. Phipps specifically faulted Hillstrom for failing: (1) to sufficiently utilize the Nova Quick Management Guide by displaying all designated room types and room rates; (2) to provide Phipps with requested backup documentation for items listed in the Guide; (3) to consult with Phipps about changes in the status of various room packages and discounted specials prior to the changes/adjustments being made; (4) providing Phipps with daily central reservation office reports; (5) providing Phipps with completed "call around sheets" identifying the rates of local competitor hotels; (6) requiring all staff to be in proper uniforms; (7) making certain that check-in staff used the guest's name at least three times; and (8) making sure that registration cards were completely filled out. In his deposition, Hillstrom conceded the accuracy of some, but by no means all, of Phipps' criticisms.

8. Phipps testified that under his stewardship, the Best Western TLC had a 100 percent occupancy rate on seventy-eight occasions (as

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In practice, this rule acts to dispose of cases that are so lacking in either "factual foundation" or "legal merit" that trial would be a useless exercise. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). To facilitate this process, the court must "accept the properly documented facts in the light most favorable to the nonmovant, resolving all genuine conflicts in his favor, while at the same time refusing to indulge rank speculation or unsupportable hyperbole." *Conward v. Cambridge School Committee,* 171 F.3d 12, 18 (1st Cir.1999). A dispute of fact is genuine only if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32 (1st Cir.1994). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

### Federal and State Gender and Age Discrimination Claims

When the plaintiff presents direct evidence of discrimination "the case may be put to the jury without further ado." *Cardona Jimenez v. Bancomercio de Puerto Rico,* 174 F.3d 36, 40 (1st Cir.1999). When, as here, there is no direct evidence of discrimination, the court follows the familiar path charted by *McDonnell Douglas*

*Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In these related cases, the Supreme Court developed a burden-shifting framework to be used in evaluating disparate treatment claims. According to this framework, if a plaintiff succeeds in establishing a prima facie case of discrimination, a presumption of discrimination arises. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for an adverse employment action. *McDonnell Douglas, supra* at 802, 93 S.Ct. 1817; *Burdine, supra* at 252–253, 101 S.Ct. 1089. *See also Sinai v. New England Tel. and Tel. Co.,* 3 F.3d 471, 473–474 (1st Cir.1993). If the employer comes forward with a nondiscriminatory explanation, the presumption is rebutted and disappears from the case. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff then has the opportunity to demonstrate "through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that [age or sex discrimination] was." *Id.* at 507–508, 113 S.Ct. 2742 (quoting *Burdine, supra* at 256, 101 S.Ct. 1089). *See also Mesnick,* 950 F.2d at 825. A showing of pretext alone provides a sufficient basis for a verdict in a plaintiff's favor, but such a verdict is not compelled. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

> Depending on the facts and circumstances of each case, the original prima-facie case plus the evidence of pretext may suffice to raise an inference of discrimination, or additional evidence may

opposed to only twelve prior to his arrival), and that hotel revenues increased from $2.7

million to $4 million within a year and a half of his taking the helm.

be required. There is no absolute rule that a discrimination plaintiff must adduce evidence in addition to that comprising the prima facie case and the rebuttal of defendant's justification in order to prevail either at the summary judgment stage or at trial. *See Connell [v. Bank of Boston,* 924 F.2d 1169, 1172 n. 3 (1st Cir.1991).], 924 F.2d at 1172 n. 3; *but see Olivera [v. Nestle Puerto Rico, Inc.],* 922 F.2d at 48 (stating that in this circuit a plaintiff must adduce additional evidence of discrimination). "Rather, the evidence as a whole, whether direct or indirect, must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by [discriminatory] animus." *Connell,* 924 F.2d at 1172 n. 3 (emphasis added). If no such inference can be drawn, summary judgment is appropriate.

*Villanueva v. Wellesley College,* 930 F.2d 124, 128 (1st Cir.1991).[9]

■ To establish a prima facie case of age discrimination, Hillstrom must demonstrate that: (1) he was over forty years of age; (2) he suffered an adverse job action; (3) his job responsibilities were assumed by another person with similar skills, thus demonstrating the employer's continuing need for an employee with those skills; and (4) he was qualified for the position and performing well enough to rule out inadequate performance as the explanation for the adverse job action. *Keisling v. SER–Jobs for Progress, Inc.,* 19 F.3d 755, 760 (1st Cir.1994). Under federal law, a plaintiff need not have been replaced by a person outside the protected class, only by someone "substantially" younger. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 311–312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).[10]

■ Hillstrom was terminated at age 42, and was replaced by someone substantially younger with arguably similar skills (Auranen).[11] While the first, second, and third elements of Hillstrom's case are thereby satisfied, Hillstrom's prima facie case founders on the issue of adequate job performance. Hillstrom offers no evidence rebutting the essential accuracy of Phipps' dissatisfaction with his job performance other than the fact that LaCava Sr. and LaCava Jr. had found it acceptable prior to Phipps' appointment and the implementation of his new managerial regimen. *See Rojas v. Florida,* 285 F.3d 1339, 1343 (11th Cir.2002) ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."); *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 474 (6th

**9.** The plaintiff must do more than simply question the employer's reasons or motives. *Gadson v. Concord Hosp.,* 966 F.2d 32, 34 (1st Cir.1992). He must put forward "definite, competent evidence fortifying [his] version of the truth." *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993). "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole ... must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age [or gender] animus.'" *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 843 (1st Cir. 1993), *quoting Connell,* 924 F.2d at 1172 n. 3 (1st Cir.1991).

**10.** The elements of a prima facie case of age discrimination under state law are virtually identical. *Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 646 N.E.2d 111. 441 (1995). However, under state law, the replacement worker must be at least five years younger in age to meet the *O'Connor* substantiality test. *Knight v. Avon Products, Inc.,* 438 Mass. 413, 424, 780 N.E.2d 1255 (2003).

**11.** While one might question whether a 42 year old male is an "older" American, state and federal law draw the line defining the protected class of age discrimination claimants at 40 years of age and older.

Cir.2002) ("It is simply stating the obvious to observe that what may have satisfied one management regime does not necessarily satisfy its successor ..."); *Dammen v. UniMed Medical Center*, 236 F.3d 978, 982 (8th Cir.2001) ("We fail to see how events which occurred during Dammen's work relationship with [his prior supervisor] can alter Dammen's poor relationship with and poor performance under [his present supervisor]. '[T]here is nothing inherently discriminatory in an employer choosing to rely on recent performance more heavily than past performance in deciding which employees to terminate during [a reduction in force].' ").[12]

■ While Best Western TLC is not obligated to come forward with a nondis-

criminatory explanation for Hillstrom's termination (poor job performance), unless Hillstrom first succeeds in establishing a prima facie case, disparate treatment cases do not always conform neatly to the *McDonnell Douglas–Burdine* paradigm. Employers routinely anticipate a plaintiff's prima facie case, as Best Western TLC has done here, given the relative ease with which, in most cases, the prima facie case can be made, and gird themselves instead for combat over pretext, the battle ground on which these cases are typically fought.[13] This case is the exception. Because Hillstrom has failed to demonstrate that his job performance met the legitimate expectations of his employer, his age discrimination case fails at the preliminary stage.[14]

**12.** Hillstrom also complains that Phipps presented his critique in a hostile and unpleasant manner. Churlish and insensitive behavior on the part of a supervisor, while lamentable, does not fall within the ambit of the anti-discrimination laws. Even if Phipps' criticisms were unfair, as Hillstrom contends, that is a matter of no legal consequence unless Phipps' critique was motivated by a discriminatory animus. *Keeler v. Putnam Fiduciary Trust Co.*, 238 F.3d 5, 12–13 (1st Cir.2001).

**13.** If the prima facie case is made, the ultimate issue becomes one of discriminatory animus. Where, as here, the employer has offered a nondiscriminatory explanation of Hillstrom's termination, Hillstrom would have the burden of demonstrating that the reason given (inadequate job performance) was a pretext for discrimination. Hillstrom's evidence of disparate treatment is "the fact that 75% of all the individuals terminated by Phipps were over 40 and 87% were male." (If I read plaintiff's Exhibit M correctly, the actual termination figures are 42% over 40 and 74% male). Without any evidence of the age and gender distribution of Best Western TLC employees supervised by Phipps, the statistical evidence, even if accurate, is virtually meaningless. "[S]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee. This is be-

cause a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual." *LeBlanc*, 6 F.3d at 848. *See also Byrd v. Ronayne*, 61 F.3d 1026, 1032 n. 7 (1st Cir.1995) (same); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir.2002) (observing that while statistics have a place in disparate treatment cases, "the statistics 'must show a stark pattern of discrimination unexplainable on grounds other than [age or gender].' ") "[A] reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742. A reason is not shown false by merely questioning the employer's credibility. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260–261 n. 3 (1st Cir.1994).

**14.** A prima facie case of gender discrimination under federal and state law is premised on essentially the same elements, substituting gender for age as the defining characteristic of the protected class. *See Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir.1994); *Beal v. Board of Selectmen of Hingham*, 419 Mass. 535, 544, 646 N.E.2d 131 (1995). Hillstrom's prima facie case of gender discrimination fails on the same ground as does his prima facie case of age discrimination. Hillstrom's evidence of gender-based pretext

*Family and Medical Leave Act*

The FMLA guarantees an eligible employee "up to twelve weeks of unpaid leave per year ... when the employee has 'a serious health condition that makes [him or her] unable to perform the functions of [his or her] position,' 29 U.S.C. § 2612(a)(1)(D)." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998). "[S]erious health condition' means an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Following a qualified absence, the employee is entitled to be restored to the same position or to an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority. 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100(c) (1997). If an employer refuses to restore an eligible employee to the same or equivalent employment upon his return from leave, the employer violates the Act. *See* 29 C.F.R. § 825.220(b) (1997) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act."). The Act is also violated if the employer "interferes with" the employee's exercise of any other FMLA right. *Id.* The statute does not explicitly make it unlawful to retaliate against an employee for exercising his rights under the FMLA (such as placing a returning employee in a less desirable job). Nevertheless, the Act was clearly intended to provide such protection, and Department of Labor (DOL) regulations implementing the FMLA interpret the Act to prohibit such actions. *See* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave."). The DOL regulations are entitled to deference. *See Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If Congress has explicitly left a gap for the agency to fill, then there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

■ There is no dispute that Hillstrom suffered from a qualifying "serious health condition" under the FMLA and that his leave-taking triggered Best Western TLC's obligation to return Hillstrom to the same or an equivalent position upon his return. For the most part, this was the case. Hillstrom resumed his duties running the Rooms Division, albeit with a less expansive title,[15] and with the same pay and benefits as he had enjoyed before. Three things had changed. Hillstrom lost his private office. He now reported through Phipps rather than directly to LaCava Jr., while the hotel's maintenance engineer, who had previously reported to Hillstrom, now also reported to Phipps. The question arises whether by "same or equivalent position" the FMLA means that the employee must be returned to a position identical in all respects to the one he

---

is the fact that Auranen, his "replacement," was hired two weeks before he was fired, ostensibly showing that Phipps did not seriously intend to give Hillstrom the thirty promised days to improve his performance. The argument ignores the fact that Auranen assumed only one aspect of Hillstrom's duties, his oversight of the front desk, and this only after he was fired. Phipps took over Hillstrom's larger responsibilities for the oversight of housekeeping.

15. Whether Hillstrom's title in fact changed is disputed by Best Western TLC.

left, or does it mean a position that is substantially similar in its conditions of employment? The statute itself does not answer the question, while the attendant regulation is of several minds on the subject. According to 29 C.F.R. § 825.215(a), an equivalent position "is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status." Subsection (e) of the same regulation, however, defines a position with equivalent conditions of employment as one having "substantially similar duties, conditions, responsibilities, privileges and status," while subsection (f) states that "[t]he requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimus or intangible, unmeasurable aspects of the job." The de minimus qualification would seem easily to exclude the recalibration of Hillstrom's title to more accurately describe the job that he had always performed, and the reassignment of the maintenance engineer in the chain of command, as substantial changes in Hillstrom's conditions of employment. The loss of a private office is a closer question, as exclusive office space is often interpreted as an employee status symbol, although perhaps less so today, given the enthusiasm with which modern management theory has embraced the open workstation. On balance, I cannot believe that Congress, in enacting the FMLA, intended to make a federal case out of office space. *See Montgomery v. Maryland,* 266 F.3d 334, 342 (4th Cir. 2001), *vacated on other grounds,* 535 U.S. 1075, 122 S.Ct. 1958, 152 L.Ed.2d 1019 (2002) ("[T]he difference between having one's own work space and having to share space with one other person is not of such import as to implicate the protections of the governing federal law.").

That leaves Hillstrom's retaliation claim.[16] To establish a *prima facie* case of retaliation under the FMLA, Hillstrom must show "that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997). "[T]he *prima facie* burden is 'quite easy to meet.'" *Hodgens,* 144 F.3d at 159.[17] Hillstrom argues that whatever may have been the situation in March of 1999 when he returned to work, by the time he was fired a year later, his deteriorating relationship with Phipps had led to a qualitative diminution in the duties of his job. This is not borne out by the record. When Hillstrom left on leave he was managing the Rooms Division at Best Western TLC. When Hillstrom returned

---

**16.** Best Western TLC argues that Hillstrom failed to give fair notice of his intent to proceed on an alternative theory of retaliation. While there is some merit to defendant's complaint, the claim is addressed in the Opposition Memorandum and I will assume, without deciding the issue, that the claim was properly preserved.

**17.** The statute of limitations on a FMLA claim runs "not later than two years after the date of the last event constituting the alleged violation for which the action is brought" (unless the violation was willful, in which case the statute of limitations is three years). 29 U.S.C. §§ 2617(c)(1) and (2). Hillstrom returned from his FMLA leave in March of 1999; he filed this action in April of 2001. While Best Western TLC argues that Hillstrom's action is time-barred, if one proceeds on Hillstrom's retaliation theory of the case, the "last event" (his firing) occurred well within the two-year limitations period.

from leave he resumed managing the Rooms Division. When Hillstrom was fired, he was managing the Rooms Division. The only qualitative change in his job (other than the loss of his private office) was Phipps' diminished opinion about his performance.

■ There are cases where the timing of an employer's action, coming on the heels of protected activity on the part of an employee, has been held sufficient to support an inference of retaliation on the ground that

> close temporal proximity between two events may give rise to an inference of causal connection. Thus, "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Marx,* 76 F.3d at 329; *see Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988) ("A showing of discharge soon after the employee engages in an activity specifically protected by ... Title VII ... is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation."); *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir.1986) (finding retaliatory pretext based, inter alia, upon employer's having discharged employee less than one month after her filing a discrimination charge).

*Hodgens,* 144 F.3d at 168. While Hillstrom understandably blames Phipps for the abrupt end to his nineteen year career with Best Western TLC, the fifteen months that separated his taking of FMLA leave and his termination, without more, is simply too extended a time to support a causal connection between his protected absence and Phipps' decision to fire him. *See Lewis v. Gillette, Co.,* 22 F.3d 22, 25 (1st Cir.1994); *see also Wyatt v. City of Boston,* 35 F.3d 13, 16 (1st Cir.1994).

*Breach of Contract*

■ Hillstrom asserts that the Employee Handbook distributed by LaCava created a binding contract of indefinite duration, and that he reasonably relied on its stated policy of "progressive discipline." The longstanding Massachusetts rule governing the contractual force of employee handbooks, as set out in *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 525 N.E.2d 411 (1988), focused on the usual indicia that signify a bargained for contract, meaning no contract at all for the typical at-will employee who was seldom in a position to bargain over the terms of an employee personnel manual. In *Jackson,* for example, the Supreme Judicial Court noted that in issuing the handbook

> the defendant [employer] retained the right to modify unilaterally the personnel manual's terms ... that any 'offer' made by the defendant in distributing the manual was illusory.... It is also significant that nothing in the circumstances here reveals any negotiation over the terms of the personnel manual.... Further, consistent with employment at will, no term of employment was stated in the personnel manual.... The plaintiff does not argue that any special attention was called to the manual by the defendant; there is no indication that the plaintiff signed the manual or in any way manifested his assent to it or acknowledged that he understood its terms.

*Id.* at 14–15, 525 N.E.2d 411. In *O'Brien v. New England Telephone & Telegraph Co.,* 422 Mass. 686, 664 N.E.2d 843 (1996), the Supreme Judicial Court corrected course, in apparent reaction to the overly-mechanical application of the *Jackson* factors indulged by many trial courts. In *O'Brien,* the Supreme Judicial Court held that there were enough differences be-

tween the New England Telephone (NET) personnel manual and the handbook at issue in *Jackson* to create a triable issue of fact.

> Of course, the provisions of a personnel manual on analysis may grant no rights. The *Jackson* opinion noted that, if the manual states that it provides only guidance as to the employer's policies (*id.*), it may not create any enforceable rights. Other language in the manual or employment practices may demonstrate otherwise. The NET manual of personnel practices states that it applies to all nonmanagement employees not covered by collective bargaining agreements. In no place does it state that NET reserves the right unilaterally to change the provisions of the manual or to discharge any employee without cause. It does, however, provide more than general guidance as to the employer's policies.

*Id.* at 693, 664 N.E.2d 843. *O'Brien,* however, gives little comfort to Hillstrom. The handbook acknowledgment form signed by Hillstrom stated that the LaCava handbook was offered "as a matter of information only," that the policies described "[were] not conditions of employment," and that LaCava "reserve[d] the right to modify, revoke, suspend, terminate or change any and all such [policies]" at any time. Moreover, the form went on to state that

> [t]he language used in this handbook is not intended to create, nor is it to be construed to constitute, a contract between The LaCava Company and any one or all of its employees. Your employment with The LaCava Company is at-will employment and either you or The LaCava Company may terminate the employment relationship at any

time, with or without notice, for any or no reason.[18]

Relying on a Massachusetts Appeals Court case, *Ferguson v. Host International, Inc.,* 53 Mass.App.Ct. 96, 757 N.E.2d 267 (2001), Hillstrom argues that Massachusetts law now precludes an employer from disavowing any intent to create a binding contract in issuing a personnel manual. Even assuming that an Appeals Court opinion could supersede the authority of the Supreme Judicial Court, Hillstrom misstates that holding of *Ferguson,* which says no more than that an employee handbook is binding to the extent that it creates the reasonable expectation in the mind of an employee that the employer is irrevocably committing itself to adhere to the policies set out in its personnel manual. As the Appeals Court instructed

> "if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing . . . ."

*Id.,* at 103, 757 N.E.2d 267, quoting *Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 309, 491 A.2d 1257, *modified on other grounds,* 101 N.J. 10, 499 A.2d 515 (1985). That is advice that the LaCava handbook fully anticipated.

Moreover, despite the reservation in the handbook that LaCava "retain[s] the right to administer discipline, up to and including discharge, as we deem fit in our

---

**18.** These same sentiments are prominently repeated in the introduction to the handbook itself.

judgement [sic]," there is no evidence that LaCava did not follow its progressive discipline policy in Hillstrom's case. Hillstrom was warned orally about the specific deficiencies in his performance, was asked to sign an Employee Warning Notice, was issued a written warning, and was then placed on a 30–day probation period with a final opportunity to improve his performance. Only then was he fired.

### ORDER

For the foregoing reasons, Best Western TLC's Motion for Summary Judgment is *ALLOWED*. The Clerk will enter judgment for the defendant on all claims.

SO ORDERED.