Stephanie ZADES, Plaintiff

v.

LOWE'S HOME CENTERS,
INC., Defendant.

Civil Action No. 03–30269–MAP.

United States District Court,
D. Massachusetts.

Sept. 6, 2006.

Michael O. Shea, Law Office of Michael O. Shea, Wilbraham, MA, for Plaintiff.

Stephanie D. Sarantopoulos, Littler Mendelson, PC, Minneapolis, MN, for Defendant.

## *MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

(Dkt. No. 20)

PONSOR, District Judge.

### I. *INTRODUCTION*

Plaintiff Stephanie Zades has brought this five-count complaint against her former employer, Lowe's Home Centers, Inc. ("Lowe's"), alleging age and disability discrimination in violation of state and federal law. Plaintiff also alleges a violation of the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–54.

Defendant has moved for summary judgment on all counts. For the reasons set forth below, Defendant's motion will be allowed in part and denied in part.

## II. *FACTS* [1]

The facts are set forth below in the light most favorable to Plaintiff.

### A. *Hiring and Promotion.*

Zades was born on July 21, 1948. At the age of 51, in December 1999, she was hired by Lowe's as a Cash Office Clerk.

In May 2001, Lowe's promoted her to Administrative Department Manager. In her new position, Zades was responsible for the employees in the cash office, basic bookkeeping, and scheduling. Zades worked at the front end of the store near the checkout lines, the customer service desk, and the main customer entrance and exit. As a manager who worked at the front end, Zades also helped with customer service and assisted other employees as needed. For example, she would sometimes be asked to spend time ringing up purchases on a register or working as a store greeter.

### B. *Fall 2001 Incidents.*

In September 2001, Zades was caught, in her words, "goofing off" with other employees in a hallway just off the sales floor at the back of the store. Store Manager Allen Lerch overheard this and summoned her to a back office, where he asked her to stop engaging in such behavior. (*See* Dkt. No. 23, Zades Dep. 84:6–10, 86:13–87:10, 103:7–104:2, Aug. 30, 2004; *see also id.*, Zades Dep. Ex. 15 (diagram showing relevant locations).) Two other managers were present during this discussion: District Human Resources Manager, Cheryl Smith, and Assistant Store Manager, Doug Derrico. Zades was never asked to sign anything documenting this incident, and

she did not view the conversation as a formal "counseling" session. (Zades Dep. 87:17–20; *see also* Zades Dep. 87:9–10 ("I, you know, I never sat down. I wasn't there three seconds.").) Lerch wrote a two-sentence account of the incident, noting that he, Smith, and Derrico "talked to Stephanie Zades regarding professional behavior on the salesfloor." (Zades Dep. Ex. 12.)

In December 2001, Head Cashier Latoya Shephard submitted a written complaint to Lowe's alleging that Zades had used profanity when addressing her on the sales floor. (*See* Zades Dep. Ex. 13.) Zades denies Shephard's allegations, and at the time of this litigation Shephard had no specific recollection of the incident. Zades believes that Shephard made up the complaint "[b]ecause she wanted my position." (Zades Dep. 91:11–92:13.) Zades also notes that, according to Shephard, Zades was a good employee, who showed up at work and was never late. (Dkt. No. 26, Attach. 4, Shephard Dep. 16:14–17, Aug. 31, 2004.)

After receiving Shephard's complaint, Derrico discussed the allegations with Zades. He also talked to one of her co-workers, who had been working with Zades on the day in question and denied that the allegations were true. Derrico then told Zades that he would take care of the issue, and that was the last she heard of it. (Zades Dep. 88:5–89:3.) Zades concedes that Derrico gave her a form to sign, but asserts that when she signed the document, no boxes had been checked off. (Zades Dep. 89:4–7.)

---

1. In her papers opposing Defendant's motion, Plaintiff included a report by a Division of Employment and Training Review Examiner. (*See* Dkt. No. 26, Attach. 7.) Defendant objected to the inclusion of this report as "patently improper," and Plaintiff offered to withdraw the relevant information. The court has therefore disregarded the content of this report in making its decision.

The Shephard complaint about Zades was documented in an "Employee Counseling Report." (Zades Dep. Ex. 14.) On the report, the box marked "final notice" was checked off. The report explained that Zades' behavior violated Lowe's Code of Ethics: "This action will not be accepted again. [Zades] has been talked to before about her attitude." Zades' signature does appear on the form, but there are no written comments by her in the space provided for employee responses. Derrico and Lerch both signed the report.

## C. *Zades' Health.*

Beginning in 2000, Zades began to experience symptoms of osteonecrosis, a condition that results in poor blood flow to the bones, making them brittle. Zades was formally diagnosed with osteonecrosis in 2001; she also had a diagnosis of osteoarthritis.

Zades' condition makes it difficult for her to walk distances, climb stairs, or stand for long periods of time. It also increases the risk of bone fracture, such that she might fracture a bone simply by lifting heavy weights or twisting in the wrong way. (Zades Dep. 194:9–16.) Although Zades currently walks with crutches 99% of the time, there is no evidence that she used crutches at any time while she was working at Lowe's. (*See* Zades Dep. 215:14–20.) According to Zades, when she worked at Lowe's, her condition did not prevent her from performing her job duties.

Zades informed her direct supervisor, Assistant Store Manager Leila Gestwicki, that she had osteonecrosis. (Zades Dep. 216: 11–18.) According to Gestwicki, she "assumed" that Zades had a problem with her hip, leg, or foot, because she noticed that if Zades sat for a long time, she was slow getting up. On these occasions, Gestwicki would sometimes ask Zades if she was okay. (Dkt. No. 26, Attach. 3, Gestwicki Dep. 48:4–18, Aug. 31, 2004.)

At some point in December 2001 or early January 2002, Zades told Gestwicki that she was going to be scheduling surgery. (Gestwicki Dep. 60:20–22.) In early January at the latest, Zades presented Gestwicki with a doctor's note dated December 28, indicating that Zades was scheduled to undergo hip surgery on January 17, 2002. (Zades Dep. Ex. 23, at *8 (doctor's letter); Zades Dep. 186:1–2, 188:15–22.) Zades also handed Gestwicki a time-off request. (Gestwicki Dep. 60:18–61:9, 61:19–24; Zades Dep. 191:5–12.) This written request was made using one of the generic leave forms that Lowe's made available to its employees. (Zades Dep. 201:9–12; Gestwicki Dep. 62:8–21.) The forms were posted on a wall near Zades' desk; no information about medical leaves or the FMLA was posted on the wall along with the forms. (Zades Dep. 192:10–16, 201:13–15.)

Gestwicki responded to Zades' leave request by telling Zades that she could not have the time off because the store was too busy, and that Zades would have to wait until she had vacation time. (Zades Dep. 183:7–11, 186:1–5.) According to Zades, January is the store's slowest time. (Zades Dep. 192:22–24.) Zades was upset by Gestwicki's response, and feared that she might be fired; she therefore canceled the surgery because, despite the pain she was in, Zades could not afford to lose her job. (Zades Dep. 186:6–12.)

Zades submitted her request to Gestwicki, and not to Human Resource employees, because she had been told in orientation that she should take such requests to her immediate supervisor, and because the Human Resources employees were inaccessible. (Zades Dep. 190:2–191:4.) Gestwicki did not tell Zades that she needed to take her leave request to one of these

other employees. (Zades Dep. 217:10–16.) Furthermore, Gestwicki could not recall whether she knew the requirements for FMLA leave when she worked at Lowe's. (Gestwicki Dep. 71:17–19.) To the best of her knowledge, Gestwicki never gave an employee FMLA leave while she was employed with Lowe's. (Gestwicki Dep. 72:9–12.)

As a result of her condition, Zades also made a number of other requests. (Zades Dep. 195:24–196:4.) She asked that she be provided a chair that was high enough to allow her to sit comfortably. She also asked that she be permitted to sit at work, and not required to stand for long periods at the registers or at the front door. "[A]fter some to do over the fact that [Gestwicki] said that [Canub] did not want any chairs behind the customer service desk," Zades was provided with a chair. (Zades Dep. 198:17–19.) However, Gestwicki continued to ask her to stand at the registers nearly daily for one to four hours. (Zades Dep. 198:16–17, 199:9–22.) Zades objected to Gestwicki's requests, but Gestwicki informed Zades that it was Zades' job to do anything Gestwicki told her to do. (Zades Dep. 199:23–200:4.) Gestwicki would also ask other managers, especially those who worked at the front of the store, to step in and help customers or to cover the registers. (Gestwicki Dep. 49:13–21.) Zades did not complain to human resources personnel about Gestwicki's requests or call the Lowe's AlertLine be-

cause she was afraid of retaliation and losing her job. (Zades Dep. 219:8–17.)

After Gestwicki had refused a number of Zades' requests, Zades attempted to speak to Craig Canub,[2] the new Store Manager,[3] about her problems with Gestwicki. (Zades Dep. 182:23–183:19.) Zades hoped to raise a number of her concerns with Canub. First, she wanted to complain about Gestwicki's refusal to allow Zades to take time off for surgery. In addition, she wanted to inform Canub that in spite of Zades' request that she be allowed to sit, Gestwicki still regularly asked her to perform jobs that required standing for long periods of time. Finally, Zades wished to express her concern that Gestwicki's requests were interfering with Zades' ability to perform the regular duties of her own job. Although Zades tried on several occasions to speak with Canub, she found it difficult to gain access to him. She believed that Canub would consistently defer to Gestwicki and tell other employees they were wrong, because "basically [Gestwicki] was running the store." (Zades Dep. 183:20–184:19.)

After she cancelled her January surgery due to Gestwicki's refusal to allow time off, Zades rescheduled the surgery for February. (Zades Dep. 186:6–11, 191:20–21, 192:1–2; see also Zades Dep. Ex. 23, at *10 (appointment for preadmission evaluation February 15, 2002).) Zades once again requested time off.[4] (Zades Dep. 197:22–198:3.) According to Zades, Gestwicki had no opportunity to refuse this

---

2. The parties are inconsistent in their spelling of this manager's last name ("Canup" or "Canub"). The manager's deposition uses the spelling "Canub," which also appears to be consistent with his signature as it appears on Zades' termination notice. The court will therefore refer to "Canub" throughout.

3. Craig Canub replaced Allen Lerch as Store Manager in early 2002. The precise date that this occurred is unclear, although Zades testi-

fied that the change occurred before February 2002. (Zades Dep. 115:17–116:9)

4. Although Zades clearly testified that there were two scheduled surgeries (see, e.g., Zades Dep. 191:20–21, 192:1–3), and the two separate notices of preadmission appointments corroborate this account (Zades Dep. Ex. 23, at *9, *10), the parties' accounts of the leave requests sometimes fail to distinguish clearly between the first and second requests.

second request, because the surgery was cancelled shortly thereafter when Zades contracted pneumonia. (Zades Dep. 198:5–13.) Zades was out of work due to pneumonia from February, 13, 2002 to March 4, 2002.[5]

## D. Comments About Zades' Age or Disability.

From early 2002 to the time of her termination, a number of employees made what Zades considered to be derogatory and offensive comments about her age or disability. (Zades Dep. 218:8–20.) Such comments made her fear that she would lose her job. (See Zades Dep. 159:11–13.) For example, Gestwicki asked Zades why she had to sit so much, and whether she was getting too old to stand. (Zades Dep. 158:23–159:1.) Derrico said that people with grey hair belong in the cash office and not on the sales floor because customers prefer to be waited on by younger people. (Zades Dep. 159:1–4.) Another Assistant Store Manager, James Lafleur, made comments to the effect of, "Why can't you move any faster?" and referred to Zades as "gimpy" on several occasions. Lafleur also told Zades she should dye her hair because it would make her look younger. (Zades Dep. 158:13–16, 159:7–8, 218:24–219:7.)[6]

## E. Termination.

In March 2002, shortly after Zades returned from her medical leave for pneumonia, Lowe's received two more written complaints concerning Zades' behavior. The first complaint, dated March 10, de-scribed a March 8 incident. (See Zades Dep. Ex. 18; see also Zades Dep. Ex. 20.) In her complaint, employee Carol Mazza alleged that Zades used profanity in front of Mazza's three-year-old son, when Mazza had stopped by the store to pick up her paycheck. Zades denies having used profanity in the presence of Mazza, Mazza's son, or other Lowe's customers.

The second complaint, dated March 11, also concerned a March 8 incident. (Zades Dep. Ex. 19.) Employee Dori Posner reported that Zades slammed down the phone on Posner after Posner requested Zades' help with a customer query. Zades agrees that she hung up on Posner when Posner began screaming at Zades over the phone, but contends that she did not slam the phone down.

After receiving these complaints, Lowe's took action to terminate Zades. There are several inconsistencies in Lowe's account of how this occurred. Assistant Store Manager LoFaso apparently received the relevant complaints, and then contacted Canub, the Store Manager, who, along with Smith, the District Human Resources Manager, was in Florida at the time. According to Canub, LoFaso faxed Canub and Smith the documents detailing both the earlier incidents and the two new complaints. Canub and Smith then discussed the matter and agreed that Zades should be terminated. (Dkt. No. 26, Attach. 2, Canub Dep. 32:19–33:16, 36:17–38:3, 62:17–22, Aug. 31, 2004.)

Gestwicki, however, described these events slightly differently. She testified

---

**5.** In discussing the FMLA claims, Defendant also relies in part on two additional details. First, Zades took time off for medical reasons in January 2001 when she had oral surgery. (Zades Dep. 111:1–112:8.) In addition, when Zades came down with pneumonia, Assistant Store Manager LoFaso encouraged her to see a doctor. (Zades Dep. 186:18–21.)

**6.** Zades notes that Lafleur and Shephard began living together in approximately August 2001. Zades suggests that this relationship shows some type of connection between Shephard and Lafleur and allegedly discriminatory actions taken against Zades. There is no evidence to support such speculation.

that she reviewed Zades' personnel file prior to the termination because she wanted to ensure that termination was justified. Gestwicki also discussed Zades' personnel file with Canub, and claims that she and Canub reviewed the file at the same time. (Gestwicki Dep. 43:8–46:4;) *id.* at 78:1–2 ("[The file] was in front of both of us.") Gestwicki stated that she may have had input into the decision to terminate Zades. Although she could not specifically recall whether she participated in the decision, she indicated that she believed Canub had consulted her, and that she had told him she agreed with the decision to terminate Zades. (Gestwicki Dep. 39:16–18, 86:16–87:8.)

Canub's account directly contradicts several of these details. He explicitly denied reviewing the entire personnel file at any point, explaining that he only looked at the documents faxed to him in Florida. (Canub Dep. 34:17–23, 37:10–15.) In addition, he asserted that it was not important to consult with or get information from Gestwicki prior to the termination, because an employee in her position would not "be in on the decision to terminate an employee." (Canub Dep 70:4–13; *see also* Gestwicki Dep. 96:20–97:23 (explaining that she could recommend that an employee be terminated, but that her recommendations would have to be approved and go through the store manager and Human Resources).) [7]

Zades was notified of her termination in a meeting on March 11, 2002. According to Zades, Gestwicki and LoFaso were present at this meeting. (Zades Dep. 132:4–6; *see also* Zades Dep. Ex. 20 (termination notice signed March 11, 2002, by Zades, Gestwicki, and LoFaso).) However-

er, according to Gestwicki, Canub was present; both Zades and Canub agree that he was in Florida at the time. (Gestwicki Dep. 46:5–8, 81:8–18; Zades Dep. 132:11–13; Canub Dep. 35:22–24.)

At the termination meeting, Zades signed a written notice of termination. (Zades Dep. Ex. 20.) This notice explained that she was being terminated for a "Class A" violation, namely using "profanity towards an associate" and "inappropriate behaviors at the customer service desk." At the time these incidents occurred, Zades was already "on a 'final notice' [from December 13, 2001,] because of this same occur[re]nce in the past, therefore, her actions lead to immediate termination."

Zades signed the termination, but insisted on adding her comments in the portion of the form designated for this purpose. In the few lines provided, she explained that she was not agreeing to the termination: "[n]othing was proved to me at the time of termination. I was not allowed to prove that I was not guilty." (*Id.; see also* Zades Dep. 153:21–24.) Zades did not specify in detail her other reasons for disagreeing with the termination, because she believed the comment section was reserved for general remarks. (Zades Dep. 150:23–151:14.)

Gestwicki, LoFaso, and Zades signed the termination notice on March 11, 2002. Gestwicki's signature appears a second time on the back of the form, where she added a brief notation about the date a particular incident occurred. Canub signed the form a few days later, on March 14, 2002.

---

**7.** In assessing Gestwicki's potential influence or role in the termination decision, Plaintiff suggests that the court consider the personal relationship between Gestwicki and Canub. The two began living together in the fall of 2003, around the time their son was born. (Gestwicki Dep. 8:9–9:24; Canub Dep. 8:4–16.) However, there is no evidence concerning the status of their relationship in March 2002.

Prior to her termination, Zades had received no information from Gestwicki or Canub indicating that there was a problem with her job performance. Both Gestwicki and Canub testified that they could not recall having personally seen or heard Zades using foul language or engaging in inappropriate behavior. (Gestwicki Dep. 36:14–16; Canub Dep. 53:2–9.) In addition, Gestwicki had never needed to speak to Zades either formally or informally about her performance. (Gestwicki Dep. 83:11–13, 84:2–9.)

### F. *Discipline at Lowe's.*

Lowe's divides violations into classes. Zades was terminated for a "Class A" violation, which "includes the most serious misconduct and repeated job performance problems. These serious violations normally will result in immediate discharge." (Zades Dep. Ex. 24, at 2.) Examples of "Class A" violations include "[v]erbal or physical abuse or other abusive behavior toward employees, customers or other persons on Company property" and "[v]iolations of Lowe's Code of Ethics." (*Id.* at 3; *see also* Zades Dep. Ex. 5, at 12–16 ("Code of Ethics").)

The record contains some evidence to suggest that Lowe's may not have consistently enforced its prohibition on profanity. For example, Lafleur testified that he witnessed Zades using profanity on other occasions, yet never reported those incidents. Lafleur also testified that despite his position as a manager, he was not even certain whether it was his responsibility to report the use of profanity to upper management. (Dkt. No. 26, Attach. 5, Lafleur Dep. 12:14–14:11, Aug. 31, 2004.) Shephard, the co-worker who complained about Zades' use of profanity in December 2001, testified that it was acceptable to use profanity in the presence of other employees, that she herself had done so, and that she had never been spoken to or disciplined for such actions. (Shephard Dep. 33:10–35:8.)

### G. *Zades' Replacement.*

Zades was replaced by Kelly Frasier, an individual under the age of forty who had completed the training program for assistant store managers.

### III. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine where "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Velez–Rivera v. Agosto–Alicea,* 437 F.3d 145, 150 (1st Cir.2006) (quotation omitted). A fact is "material" where it "has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 428 (1st Cir.1996).

The court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Pac. Ins. Co. v. Eaton Vance Mgmt.,* 369 F.3d 584, 588 (1st Cir. 2004) (quotation omitted). While the moving party bears the initial burden of showing that no genuine issues of material fact exist, the burden then "shifts to the non-moving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *Sands v. Ridefilm Corp.,* 212 F.3d 657, 661 (1st Cir.2001) (quotation omitted). "Neither party may rely on conclusory allegations or unsub-

stantiated denials ... to demonstrate either the existence or absence of an issue of fact." *Kiman v. NH Dep't of Corr.*, 451 F.3d 274, 282 (1st Cir.2006).

In an employment case, courts must be "particularly cautious" about granting an employer's motion. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) (quotation omitted); *see also Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 646 N.E.2d 111, 114 (Mass.1995) (citations omitted) (describing summary judgment in such cases as a "disfavored remedy"). Nonetheless, courts do regularly grant summary judgment in employment cases. *See, e.g., Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir.2003); *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003); *Brunner v. Stone & Webster Eng'g Corp.*, 413 Mass. 698, 603 N.E.2d 206, 211 (Mass. 1992).

## IV. *DISCUSSION*

### A. *Age Discrimination (Count I and Count II).*

Both the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, and Mass. Gen. Laws ch. 151B prohibit an employer from discharging or otherwise discriminating against an employee because of that employee's age. 29 U.S.C. § 623(a)(1); Mass. Gen. Laws ch. 151B, § 4.

Plaintiff alleges that Lowe's violated both statutes by discriminating against her based on age. Such claims proceed under the familiar three-part *McDonnell Douglas* burden-shifting framework. *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 68 (1st Cir.

2002); *Sullivan v. Liberty Mut. Ins.* Co., 444 Mass. 34, 825 N.E.2d 522, 530 (Mass. 2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–205, 93 S.Ct. 1817 (1973).[8]

### 1. *Plaintiff's Prima Facie Case.*

At the first stage, the burden is on Plaintiff to establish a *prima facie* case of discrimination. Zades must show that: (1) she was at least forty years old; (2) her job performance met Lowe's legitimate expectations; (3) Lowe's subjected her to an adverse employment action; and (4) Lowe's had a continuing need for the services provided by the position from which she was discharged. *Hoffman v. Applicators Sales & Serv., Inc.*, 439 F.3d 9, 17 (1st Cir.2006).

The only real dispute at this stage is whether Plaintiff's job performance met Lowe's legitimate expectations. Plaintiff notes that Lowe's promoted her, and that a co-worker described her as a good employee. In addition, she points to the fact that neither Gestwicki nor Canub had seen her engage in inappropriate behavior, or felt the need to address performance issues formally or informally with Plaintiff.

Defendant contends that Plaintiff cannot make out a *prima facie* case, because she failed to meet Lowe's legitimate expectation that employees, and particularly managers, behave in a respectful manner and maintain a professional demeanor at the workplace. However, Plaintiff denies most of the alleged conduct on which Lowe's relies in reaching this conclusion. She concedes that there was one incident where she was found to be "goofing off," but contends that Defendant has exagger-

---

**8.** In her papers, Plaintiff occasionally characterizes certain pieces of evidence as "direct evidence." Direct evidence cases are not analyzed under the burden-shifting framework. *See Cariglia v. Hertz Equip. Rental Corp.*, 363

F.3d 77, 83 n. 2 (1st Cir.2004). However, since Plaintiff consistently analyzes her claims under the *McDonnell Douglas* framework, the court will do so as well.

ated the details of this incident and denies all remaining allegations of misconduct.[9]

The employee's initial burden in demonstrating a *prima facie* case "is not an onerous one." *Benoit*, 331 F.3d at 173 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Plaintiff has put forth sufficient evidence for a reasonable jury to conclude that her job performance met Lowe's legitimate expectations.

### 2. Pretext Analysis.

■ Since Plaintiff has made out a *prima facie* case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant contends that Plaintiff was terminated based on reports of her repeated use of profanity in front of employees and customers.

Because Defendant has articulated a legitimate, nondiscriminatory reason for its action, the burden shifts back to Plaintiff "to establish 'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Quinones v. Buick*, 436 F.3d 284, 289 (1st Cir.2006) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "At the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was

[age] discrimination." *Id.* at 289–90 (quotation omitted). The "ultimate burden on the plaintiff is to show that discrimination is the or a motivating factor." *Hoffman*, 439 F.3d at 17.[10]

■ Defendant dismisses the possibility of pretext by setting forth a simple narrative: upon receiving independent complaints, two decisionmakers, Canub and Smith, made a good faith decision to terminate based on their independent review of Plaintiff's prior disciplinary record. As Defendant notes, at this stage in the analysis, Plaintiff's view of the accuracy of the complaints against her is not relevant. Plaintiff cannot contest the fact that Lowe's actually received written complaints from her co-workers, and that Lowe's then took action against her. "[T]he issue is not whether [Lowe's] reasons to fire [Zades] were real, but merely whether the decisionmakers—[Canub] and [Smith]—believed them to be real." *See Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 674 (1st Cir.1996); *see also Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991) ("The ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age. Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." (quotation and citation omitted)), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

**9.** Plaintiff cannot, of course, dispute the fact that Defendant received complaints from other employees, which then created a belief that she was not meeting job expectations. However, at this stage of the analysis, Defendant's *belief* that Plaintiff had engaged in certain behavior should not control.

**10.** Plaintiff contends that federal and state law diverge on the question of pretext, in that

the state standard is more generous to plaintiffs. *Cf. Fite v. Digital Equip. Corp.*, 232 F.3d 3, 7 (1st Cir.2000) ("federal and Massachusetts law are now generally aligned on the pretext issue"). Because this court will conclude that Plaintiff has succeeded in meeting her burden under the federal standard, any potential distinction will not be relevant.

Defendant therefore characterizes the age-related remarks by various Lowe's managers as stray comments unrelated to the decisionmaking process. The probativeness of such comments "is circumscribed if they ... were not related to the employment decision in question, or were made by nondecisionmakers." *Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 36 (1st Cir.2001) (quotation and citations omitted). Thus, a stray remark "would not be significantly probative of *pretext* absent some discernible indication that its communicative content, if any, materially erodes the stated rationale for the challenged employment action." *Id.* (emphasis in original).

Plaintiff relies on a very different narrative, in which the decisionmaking process that led to her termination was tainted by the age-based animus of managers at Lowe's. Plaintiff contends that several managers made derogatory, age-related remarks in the period from January 2002 until Plaintiff's termination, and that these remarks show that there was "an atmosphere of age discrimination," which influenced the decision to terminate her. *Ruiz v. Posadas de San Juan Assocs.,* 124 F.3d 243, 249 (1st Cir.1997) (such comments add "color" to a plaintiff's claims about the decisionmaking process, but "proof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual") (citations and quotation omitted).

Plaintiff argues that, in particular, Derrico and Gestwicki took specific actions against her that were motivated by age-based animus. First, she points to Derrico's comment about keeping people with grey hair away from customers, and ar-

gues that his decision to issue her with a "final notice" was driven by his discrimination. Although it was Shephard who came forward complaining that Plaintiff used profanity, Plaintiff suggests that Derrico took advantage of this allegation—which was denied by Zades and another—to sanction her. To bolster her claim, Plaintiff points to testimony by Shephard and Lafleur regarding the use of profanity at Lowe's, and argues that Defendant had a less than universal or consistent commitment to punishing such behavior. Based on this evidence, a reasonable factfinder could infer that Derrico was motivated by an impermissible animus when he issued the "final notice."

The record is clear that this "final notice" played a critical role in the decision to terminate Plaintiff. As the termination notice states: "[Zades] is currently on a 'final notice' because of this same occur[re]nce in the past, *therefore, her actions lead to immediate termination*" (emphasis added). In addition, various individuals who participated in the termination process (*i.e.* Canub, Smith, LoFaso, and Gestwicki) reviewed this "final notice" before Plaintiff was terminated.

The second manager whose role is critical to Plaintiff's account is Gestwicki. Plaintiff contends that Gestwicki revealed her age-based animus when she asked Plaintiff whether she was too old to stand. *Cf. Mulero,* 98 F.3d at 676 (no question that statement by decisionmaker that employee was "too old to handle" a particular task can be evidence of discrimination). Gestwicki's role in termination process is hotly disputed and the subject of inconsistent testimony.[11] As noted above, Gest-

---

11. Plaintiff argues that these inconsistencies are themselves probative of pretext. *See Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 56 (1st Cir.2000) (A plaintiff can

"establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could

wicki testified that prior to the termination, she reviewed Plaintiff's personnel file, discussed its contents with Canub, and informed him that she agreed with the decision to terminate. Other evidence supports a finding that Gestwicki played some role in the termination: she signed the termination notice and even added a notation clarifying the description of the allegations against Plaintiff.

The record therefore fairly supports an inference that Gestwicki played some role in the termination, and that her actions with respect to Plaintiff were tainted by an impermissible age-based bias. To be clear, there is no evidence that Gestwicki was ultimately responsible for the termination decision. At most, she was *a* decisionmaker; the record shows that Canub and Smith retained ultimate decisionmaking authority.

Because there is significant evidence that Derrico's "final notice" played a critical role in the termination decision, as well as limited evidence that Gestwicki took some action in relation to the decision, the critical question is whether the ultimate decision was truly independent. Where a neutral decisionmaker takes independent action against an employee, that person's "independent decision to take adverse action breaks the causal connection between [a] supervisor's retaliatory or discriminatory animus and the adverse action." *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 343 (Mass.2004). However, this "causal connection" is not broken where a decisionmaker acts on biased information without conducting his own independent investigation. *See Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 86–88, 87 n. 4; *cf. Thomas v. Eastman*

*Kodak Co.*, 183 F.3d 38, 50 (1st Cir.1999) (noting in statute of limitations context that "Title VII extends to a neutral employer decision-making process that relies on discriminatory evaluations."), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). Thus the biases of an individual who influences the employment decision *are* probative. *See Cariglia,* 363 F.3d at 85 (collecting cases); *cf. Ronda–Perez v. Banco Bilbao Vizcaya Argentaria,* 404 F.3d 42, 45 (1st Cir.2005) (taking note of the fact that there was no allegation of bias against any of the employees interviewed as part of the decisionmaking process).

Regardless of whether Canub and Smith acted in good faith and without bias when they decided to terminate Plaintiff, there is no evidence that they conducted an independent investigation. Rather, the record shows that neither was present at the store and that they instead relied primarily on excerpts from Plaintiff's personnel file.[12] *See Cariglia,* 363 F.3d at 87 n. 4 (citing *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 420 (7th Cir.1994)) (non-decisionmaker's animus cannot be imputed when the plaintiff was able to appear before the decisionmaker and present his side of the story). There is no evidence in the record that another employee carried out an independent investigation on Canub's behalf. The fact that LoFaso contacted Canub after receiving the complaints and then faxed the relevant documents to him, does not suffice to show that LoFaso carried out an investigation. Thus, a reasonable factfinder could conclude that the decisionmaker relied on information—Derrico's "final notice" and to a lesser degree, Gest-

---

infer that the employer did not act for the asserted non-discriminatory reasons." (quotation omitted)).

**12.** This conclusion should not be read to preclude the possibility that he relied to some degree on Gestwicki's input.

wicki's opinion—that was infected by impermissible age-based bias.

■ Plaintiff's claim relies on a record that is highly contested, and at times paper-thin. However, taking the facts in the light most favorable to Plaintiff, and drawing all reasonable inferences in her favor, Plaintiff's age discrimination claims just barely survive Defendant's Motion for Summary Judgment. A reasonable factfinder could find that Derrico and Gestwicki harbored discriminatory animus and used the complaints of other employees as pretext to mask their real motives for undertaking or participating in disciplinary action against Plaintiff. A reasonable factfinder could also conclude that Canub did not engage in an independent investigation of the allegations against Plaintiff and thereby break the causal connection between Derrico and Gestwicki's animus and Plaintiff's termination.

Thus Defendant's Motion for Summary Judgment will be denied as to Count I and Count II.

## B. Disability Discrimination (Count III and Count IV).

Plaintiff alleges disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, and Mass. Gen. Laws ch. 151B. These laws prohibit an employer from discriminating against a qualified individual with a disability. 42 U.S.C. § 12112(a); Mass. Gen. Laws ch. 151B, § 4. The ADA also specifically prohibits an employer from "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . the accommodation would impose an

undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *see also Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 106 (1st Cir.2005) (noting that failure to accommodate claims arise under both the ADA and Chapter 151B).

Plaintiff's disability claims appear to rely on two different theories of liability. First, Plaintiff alleges that she was subject to disparate treatment when Lowe's terminated her based, in part, on its perception that she was disabled. Second, she claims that Lowe's failed to reasonably accommodate her disability. *See Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir.2002) (distinguishing these two bases for liability).

A disparate treatment claim is analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Tobin*, 433 F.3d at 104. To establish a *prima facie* case of disability under the ADA and Chapter 151B,[13] Plaintiff must show that she: (1) had a disability as defined by the statutes; (2) was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) was discharged. *Carroll*, 294 F.3d at 237. A failure to accommodate claim requires that Plaintiff show, "in addition to the first two prongs set forth above, that [Lowe's], despite knowing of [her] alleged disability, did not reasonably accommodate it." *Id.* at 237.

Under either theory, Plaintiff must first make a threshold showing of disability. Under the ADA, a disability is

(A) a physical . . . impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such an impairment; or

---

13. Claims brought pursuant to the ADA and Chapter 151B can generally both be analyzed following the federal model. Although federal and state law do diverge on some issues, neither party suggests that any such distinctions are relevant in this case. *See Carroll v. Xerox Corp.*, 294 F.3d 231, 237 n. 3 (1st Cir. 2002).

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see also* Mass. Gen. Laws ch. 151B, § 1(17). Although Plaintiff invokes both the first and third definitions, she primarily focuses on a claim that she was "regarded as" disabled.

### 1. The § 12102(2)(A) Claim (Actual Disability).v

██ Plaintiff contends that she is disabled as defined in § 12102(2)(A). To establish a disability under this provision, Plaintiff must: (1) show that her alleged condition constitutes a physical impairment; (2) identify the "major life activities," *i.e.*, "activities that are of central importance to daily life," on which her claim relies; and (3) show that her impairment substantially limits these major life activities. *See Carroll*, 294 F.3d at 238 (quotations and citations omitted).

Plaintiff asserts that her osteonecrosis (and perhaps her osteoarthritis[14]) is a physical impairment that substantially limits the major life activities of standing and walking. Plaintiff's claim is severely hampered by her failure to develop either the legal argument or factual basis on which it rests.[15] Instead, Plaintiff rests entirely on a conclusory statement that she is in fact disabled, and on the portions of her deposition where she describes her diagnosis and its physical effects. Plaintiff has not, for example, submitted any medical evidence documenting either her condition or any restrictions she may have as a result of her condition. *See Poh v. Mass. Corr. Officers Federated Union*, No. 03–11987–RWZ, 2006 WL 1877089, at *2 (D.Mass. July 7, 2006) (finding that plaintiff had not proved disability, in part because plaintiff provided no evidence of substantial limitation beyond her own affidavit). Moreover, despite Plaintiff's conclusory statements to the contrary, the record is clear, based on her own testimony, that, although she did not want to stand for long periods of time, she was able to do so daily for at least one to four hours.[16]

Based on the record before the court, Plaintiff cannot show that she is disabled under § 12102(2)(A).

### 2. The § 12102(2)(C) Claim ("Regarded as" Disabled).

██ Plaintiff's disability claims rest primarily on her contention that she was "regarded as" disabled by Lowe's. A plaintiff who seeks to show that she is entitled to protection under this provision has a specific task: she "cannot merely show that [her] employer perceived [her]

---

**14.** The record is almost completely devoid of any information on this second condition.

**15.** In her original memorandum opposing summary judgment, Plaintiff noted in passing that she could "prove that Lowe's discriminated against her based on her real or perceived handicap and/or disability...." (Dkt. No. 25, Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 12.) Because Plaintiff failed to discuss the "real" disability claim in the remainder of her memorandum, focusing instead on a "regarded as" argument, Defendant concluded that Plaintiff had conceded that she was not actually disabled. In her surreply, Plaintiff denied making any such concession: "The fact the Plaintiff has argued that she was 'regard-

ed as' disabled and/or handicapped by Lowe's management does not preclude the fact that she was disabled. During her tenure at Lowe's, the Plaintiff was substantially limited in performing the major life activities of walking and standing." (*See* Dkt. No. 31, Pl.'s Sur–Reply Mem. Opp'n Def.'s Mot. Summ. J. 12 (citations omitted).) However, once again, Plaintiff's memorandum went on to discuss only the "regarded as" claim.

**16.** At her deposition in August 2004, Plaintiff testified that she now uses crutches 99% of the time. As noted above, there is no evidence that she used crutches when she worked at Lowe's.

as *somehow* disabled; rather, [s]he must prove that the employer regarded [her] as disabled *within the meaning of the ADA.*" *Bailey v. Ga.-Pac. Corp.,* 306 F.3d 1162, 1169 (1st Cir.2002).

Plaintiff argues that her employer regarded her as substantially limited in the major life activities of standing and walking and points to two categories of evidence to support this claim. First, she notes that Gestwicki knew of her condition, Zades told Gestwicki both that she had osteonecrosis and that she needed surgery on her hip. Gestwicki also observed Plaintiff's difficulty in standing.[17] Second, Plaintiff points to the fact that Gestwicki responded dismissively to Plaintiff's requests for accommodations.

Plaintiff's first category of evidence shows that Defendant was aware that Plaintiff had a specific medical condition, or at the very least, a hip condition, and that this condition meant that Zades would get up slowly when she had been standing for a long period.

It is much less clear, however, how the second category of evidence supports Plaintiff's claim at all. The fact that Gestwicki ignored Plaintiff's requests for accommodations and continued, for example, to ask that Plaintiff work as a greeter or stand at a register for one to four hours daily, strongly suggests, if anything, that Gestwicki did *not* believe Plaintiff had a substantial limitation in the areas of standing or walking. A plaintiff might, perhaps, attempt to argue that this type of evidence demonstrates an employer's desire to force out an employee with a disability by making it impossible for the employee to perform her job. In this case, however, this conclusion would be pure speculation, and would require the court to first assume the very thing that Plaintiff has not proved, *i.e.,* that Defendant regarded her as disabled.

The evidence on which Plaintiff relies is simply insufficient to establish that she was "regarded as" disabled by Defendant.

Because Plaintiff has not succeeded in establishing that she is disabled under either of the provisions of § 12102(2) on which she relies, the court will allow summary judgment for Defendant on the disparate treatment and failure to accommodate claims in Count III and Count IV.

It is noteworthy that, even had Plaintiff succeeded in showing disability under either § 12102(2)(A) or (C), virtually no evidence supports her disparate treatment claim. Plaintiff's age discrimination claim survives summary judgment by only the slimmest of margins, and the record supporting a disability discrimination claim is significantly weaker. There is, for example, no evidence to show that Derrico discriminated on the basis of disability. Gestwicki's comments, while explicitly directed to Plaintiff's age, are at best ambiguous in their applicability to disability. And although Lafleur apparently referred to Plaintiff in quite derogatory terms, there is no evidence that he had any influence on the decisionmaking process surrounding Plaintiff's termination; thus his remarks are stray comments with no probative value.

C. *Retaliation Based on Disability (Count III and Count IV).*

Count III and Count IV also include an allegation that Defendant retaliated

---

**17.** Plaintiff argues that Gestwicki "negatively commented" on Plaintiff's obvious difficulty in standing. The record on which Plaintiff relies shows that on these occasions, Gestwicki asked Plaintiff if she was okay. Plaintiff may also be alluding to Gestwicki's testimony that she "assumed" Plaintiff had hip, leg, or foot problems because of Plaintiff's apparent difficulty in standing up. Neither comment is negative on its face, and there is nothing in the context in which either comment was made that implies otherwise.

against Plaintiff in violation of the ADA and Chapter 151B. Retaliation is an independent cause of action under both statutes. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir.2003) (noting that a plaintiff need not succeed on a discrimination claim to bring a retaliation claim); *see also* 42 U.S.C. § 12203(a); Mass. Gen. Laws ch. 151B, § 4.

█ To establish a *prima facie* claim for retaliation, Plaintiff must show that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between her conduct and the adverse employment action. *See Wright*, 352 F.3d at 478 (analyzing both ADA and 151B retaliation claims under this standard).

█ The parties focus on the third prong of this test. Plaintiff contends that there is a causal connection between her termination and any protected activity, because Plaintiff requested accommodations[18] from Gestwicki, was terminated shortly thereafter, and Gestwicki played some role in the termination.

Defendant once again contests any connection between Gestwicki and the termination decision and emphasizes that Canub and Smith were the ultimate decisionmakers. These issues were addressed above in the discussion of the age discrimination claims.

The "prima facie burden in this context is not an onerous one." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 26 (1st Cir.2004). Plaintiff has pointed to sufficient evidence to meet this slight burden.

As before, Defendant can articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. The question then becomes whether Plaintiff can show that Defendant's articulated reason was pretext for its retaliatory motive.

Evidence and inferences properly drawn from evidence presented during a *prima facie* case may be considered in analyzing pretext. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998). For example, temporal proximity may give rise to an inference causal connection and retaliatory motive. *Id.* at 168. Plaintiff requested accommodations in the two months prior to her termination. There is also evidence that Gestwicki was hostile to the requests, allowing Plaintiff a chair only after a "to-do" about the issue, and ignoring the request that Plaintiff not be required to stand.

Plaintiff can also point to some of the evidence used to support a showing of pretext on her age discrimination claims. For example, there is Defendant's inconsistent account of the termination process, as well as evidence suggesting that Lowe's may not have applied its profanity prohibition consistently.

Although Plaintiff's evidence is hardly overwhelming, a reasonable factfinder could find that Defendant's decision to terminate her was pretext for its retaliatory animus. Defendants' Motion for Summary Judgment on the retaliation portions of Count III and Count IV will therefore be denied.

### D. FMLA Violation (Count V).

In enacting the FMLA, Congress sought "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1). The FMLA therefore provides qualified employees with substantive rights and prohibits employers from interfering with employees' exercise of such

---

**18.** Although it has not expressly decided the issue, the First Circuit has assumed *arguendo* that simply requesting an accommodation, without more, is behavior protected from an employer's retaliation. *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir.2003).

rights. *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 330 (1st Cir.2005). Under the Act, qualified employees "shall be entitled to a total of 12 workweeks of leave during any 12–month period," 29 U.S.C. § 2612(a)(1), and "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any [such] right," 29 U.S.C. § 2615(a).

### 1. *Interference with Substantive Rights.*

Plaintiff alleges that Defendant violated the FMLA when it refused her request for time off to undergo surgery on her hip.[19] An employee who seeks to establish a claim of interference with her substantive rights, "need only show, by a preponderance of the evidence, entitlement to the disputed leave; no showing as to employer intent is required." *Colburn*, 429 F.3d at 331. Thus, to make out a claim, Plaintiff must show that: (1) she fit the definition of an "eligible employee;" (2) she worked for an employer covered by the Act; (3) she qualified for FMLA benefits for one of four statutory reasons; (4) she gave her employer appropriate notice; and (5) her employer denied her benefits to which she was entitled under the FMLA. *Wheeler v. Pioneer Developmental Servs., Inc.*, 349 F.Supp.2d 158, 164 (D.Mass.2004).

In this case, the parties focus on the fourth issue, arguing about both the timeliness and sufficiency of any notice provided by Plaintiff to her employer. The Act requires that where a request for leave is foreseeably based on planned medical treatment, the employee must "provide the employer with not less than 30 days' notice, ... except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2); *see also* 29 C.F.R. § 825.302.

In providing notice, an employee must give "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). However, the "employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.; see also Wheeler*, 349 F.Supp.2d at 166 ("In fact, an employee does not even have to know about her rights under the FMLA."). Although an employer may require that an employee comply with the employer's "usual and customary notice and procedural requirements for requesting leave," the employee's "failure to follow such internal employer procedures will not permit an employer to disallow or delay an

19. Plaintiff also argues that she was treated adversely and differently, *i.e.,* discriminated against, for requesting or inquiring about leave. Although the parties do not distinguish between this claim and the alleged denial of substantive rights, the discrimination claim is analytically distinct. Unlike a claim of interference with substantive rights, discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998).

In fact, Plaintiff's discrimination claim actually overlaps with her retaliation claim. The adverse action alleged in both claims is the same—termination—and both claims are analyzed under the same standard. *Compare Hodgens*, 144 F.3d at 161 (setting forth *prima facie* case for discrimination), *with Orta–Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 113–14 (1st Cir.2006) (setting forth *prima facie* case for retaliation). Thus rather than engaging in a duplicative analysis, the court will assume that the second "interference" claim is merely a restatement of the retaliation claim and does not need to be addressed separately. *Cf. Colburn v. Parker Hannifin/ Nichols Portland Div.*, 429 F.3d 325, 331–32 (1st Cir.2005) (distinguishing between two categories of claim that can be alleged under the "interference" language of 29 U.S.C. § 2615(a)).

employee's taking FMLA leave if the employee gives timely verbal or other notice." 29 C.F.R. § 825.302(d).

Upon receiving notice that an employee needs FMLA-qualifying leave, the "employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c). The employer may also invoke its right to "request medical certification to support the need for such leave." *Id.* (citing 29 C.F.R. § 825.305); 29 U.S.C. § 2613(a).

### 2. *Plaintiff's Claim.*

■ Because the parties in this case focus entirely on the timeliness and sufficiency of any notice provided, the court will assume that Plaintiff can make the other necessary showings.[20]

Defendant contends that Plaintiff failed to provide timely notice. It notes that Plaintiff gave Lowe's at most twenty days notice by providing Gestwicki with a December 28 doctor's letter scheduling surgery for January 17.

Plaintiff concedes that it was only in early January, *i.e.*, shortly after she received the doctor's letter, that she gave

Lowe's formal notice, by handing Gestwicki a written request and copy of the letter indicating that she needed leave. However, Plaintiff notes that earlier she had informed Gestwicki that she would soon be undergoing surgery. Moreover, there is no evidence that Plaintiff herself was aware of the precise date on which surgery would be scheduled prior to her receipt of the December 28, 2001, letter.[21] Under these circumstances, a reasonable jury could find that Plaintiff made every effort to provide Lowe's with "such notice as is practicable" under the terms of the Act.

Defendant also contends that any notice Plaintiff provided was insufficient. First, Plaintiff never submitted a leave form to any Human Resource employee, instead giving the form to her direct supervisor. Second, Defendant asserts that Plaintiff's notice to Lowe's fell far short of advising Lowe's that she required FMLA leave, because her doctor's letter does not indicate the nature of the proposed medical procedure, the impetus for the procedure, the expected duration of the procedure, or any possible post-procedure incapacity or inability to work. Third, Defendant contends that Plaintiff was or should have been well informed about her FMLA rights and therefore able to invoke them

20. Plaintiff could presumably make the necessary showings as follows. First, as Plaintiff was a full time employee at Lowe's, it seems fair to assume that she was an "eligible employee" working for an employer covered by the Act. Moreover, Plaintiff's hip condition and the required surgery appear to qualify as a "serious health condition ... that involves (A) inpatient care in a hospital ... or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Finally, Gestwicki, in refusing Plaintiff's request for leave, denied Plaintiff benefits to which she was apparently entitled under the FMLA. Defendant attempts to describe the conversation between the two as a "consultation" regarding leave scheduling. *See* 29

C.F.R. § 825.302(e). However, Gestwicki's statement that Plaintiff could not take time off and would have to wait until she had vacation time raises a genuine issue of fact with respect to whether Plaintiff was refused leave.

21. Defendant argues that it is reasonable to infer that Plaintiff knew the precise date of the surgery before she received this letter. While this is certainly a possible inference, an equally reasonable inference can be drawn in Plaintiff's favor. A reasonable factfinder could conclude that although Plaintiff was generally aware of her upcoming surgery—and therefore gave Gestwicki general notice of this fact—she herself did not herself find out the precise date of the surgery until she received the December 28 letter.

explicitly, because she held a managerial position and had previously taken a couple of days leave for oral surgery.

Defendant's first and third arguments are unpersuasive. The regulations clearly state, and Defendant has cited no case to the contrary, that Plaintiff cannot be denied her FMLA rights because she either failed to follow Defendant's internal procedures or specifically invoke the FMLA.

Defendant's second argument is also unpersuasive. Plaintiff provided sufficient notice to survive summary judgment. Defendant relies on *Szabo v. Trs. of Boston Univ.*, No. 96–10806–GAO, 1998 WL 151272, 1998 U.S. Dist. LEXIS 4104 (D.Mass. Mar.18, 1998), in which the court granted summary judgment for the defendants, because the plaintiff failed to provide notice sufficient to make her employer aware of a potentially FMLA-qualifying reason for leave. When Szabo sought leave forms from her employer, she merely said that she was "thinking of taking some time off." *Szabo*, 1998 WL 151272, at *6, 1998 U.S. Dist. LEXIS 4104, at *16.

In this case, however, Plaintiff provided Defendant with considerably more information about her leave request. Although the letter from Plaintiff's doctor provides little detail and only explains that Plaintiff will be having "surgery," Defendant received other information concerning Plaintiff's request. At some point after her diagnosis, Plaintiff told Gestwicki that she had osteonecrosis. Then, in requesting leave, Plaintiff informed Gestwicki that she would be having hip surgery. In her written request, Plaintiff asked for seven to nine days leave in connection with this surgery. Thus Defendant was not only aware that Plaintiff was "thinking of taking some time off," but knew the proposed medical procedure, the impetus for the procedure, and the expected duration of Plaintiff's leave.

This type of information is sufficient to put an employer on notice that an employee may be seeking FMLA-qualifying leave. Moreover, there is no evidence that Defendant requested further information or invoked its right to request medical certification and Plaintiff failed to comply with such a request.

Because a reasonable jury could conclude that Plaintiff suffered a violation of her FMLA rights, summary judgment will be denied on Count IV.[22]

### E. FMLA Retaliation (Count V).

Plaintiff also brings a claim for retaliation under the FMLA. While the language of the Act makes no specific reference to retaliation, the First Circuit "has recognized such a cause of action in the statute and specifically the interpretative regulation 29 C.F.R. § 825.220(c)." *Colburn*, 429 F.3d at 331 (discussing 29 U.S.C. § 2615(a)); *see also id.* at 333 (noting that retaliation is an independent cause of action under the FMLA).

The analysis for an FMLA retaliation claim tracks the ADA analysis of retaliation. *See Hodgens*, 144 F.3d at 160 (1st

---

**22.** Even if Plaintiff ultimately prevails on this count, this may turn out to be a hollow victory. The FMLA provides for compensatory damages "equal to the amount of any wages, salary, employment benefits, or other compensation which [the employee] was denied or lost by reason of the violation; interest on the compensatory damages; and, unless the court concludes that the employer acted in good faith and reasonably believed it had complied with the act, liquidated damages equal to the amount of compensatory damages plus interest." *Szabo v. Trs. of Boston Univ.*, No. 96–10806–GAO, 1998 WL 151272, at *6, 1998 U.S. Dist. LEXIS 4104, at *17 (D.Mass. Mar.18, 1998). No evidence suggests Plaintiff lost wages or other benefits by reason of any FMLA violation. The statute does not provide damages for emotional distress. *See id.* 1998 WL 151272, at* 6, 1998 U.S. Dist. LEXIS 4104, at *17–18.

Cir.1998) (holding that the Title VII/ADA framework applies to claims of discrimination and retaliation under the FMLA). The *McDonnell Douglas* burden-shifting framework applies, and to establish a *prima facie* case, Plaintiff must show that: (1) she had availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between the protected conduct and the adverse employment action. *Orta–Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 113–14 (1st Cir.2006).

Once again, only the third prong is at issue here. Plaintiff contends that she can show a causal connection between her FMLA-protected activity and her termination, in large part because of the temporal proximity between the different events. Around January 2002, Plaintiff twice asked Gestwicki for time off to have surgery on her hip. Shortly after making the second request, Plaintiff took time off for pneumonia, and then was terminated only one week after she returned to work. This showing of temporal proximity is sufficient to make out a *prima facie* case.[23]

Most of the factors discussed above in the context of Plaintiff's ADA retaliation claim are relevant to the pretext analysis here. In addition, Plaintiff can point to the fact that Gestwicki was dismissive of her leave request, refusing to allow time off, and informing Plaintiff that she would have to wait until she had vacation time to schedule her surgery.

Plaintiff's evidence is once again thin, and much of it continues to hang on the slim thread that connects Gestwicki to the termination proceedings. However, a reasonable factfinder could still find that Plaintiff had made out a claim for retaliation under the FMLA. Thus summary judgment on the retaliation portion of Count V will be denied.

## V. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (Dkt. No. 20) is hereby ALLOWED as to the discrimination claims in Count III and Count IV, but DENIED as to all other claims.

It is So Ordered.

---

**23.** In both its original memorandum and its reply, Defendant insists that *Hillstrom v. Best W. TLC Hotel*, 265 F.Supp.2d 117, 128 (D.Mass.2003), supports the proposition that a plaintiff must always show more than a temporal connection between the protected conduct and the adverse employment action to present a genuine factual issue on retaliation. This is an incorrect reading of the case; *Hillstrom* clearly states that "[t]here are cases where the timing of an employer's action, coming on the heels of protected activity on the part of an employee, *has been held sufficient* to support an inference of retaliation on the ground that close temporal proximity between two events may give rise to an inference of causal connection." *Id.* (emphasis added). The court merely goes on to note that fifteen months is too extended a time period to support a showing, without more, of a causal connection. *Id.*